**Forest Eugene SIMPSON, Petitioner,**

v.

**CITY OF TULSA, Oklahoma, a Municipal Corporation, and Worker's Compensation Court, Respondents.**

**No. 53361.**

Court of Appeals of Oklahoma, Division 2.

Aug. 19, 1980.

Released for Publication by Order of Court of Appeals Sept. 18, 1980.

Richard A. Bell, Norman, for petitioner.

Waldo F. Bales, City Atty., Robert L. Roark, Asst. City Atty., Tulsa, for respondents.

BRIGHTMIRE, Presiding Judge.

The issue here is whether the record contains competent evidence to sustain the Worker's Compensation Court's *en banc* order denying claimant compensation. We hold that it does and affirm.

I

Forest Simpson, a 49–year–old Tulsa fireman, filed a compensation claim February 15, 1978, alleging that on October 6, 1977, as a result of cleaning a fire station, he developed "[h]igh blood pressure, dizziness, chronic nervous condition and hypertension." And although he returned to work four or five shifts after the October incident and was still working at the time of trial—not only as a fireman but also as a carpet cleaner and real estate salesman— Simpson still asked for a total permanent disability compensation award.[1]

---

1. Claimant never sought nor was he paid any temporary total disability compensation pre-    sumably because he continued to work.

The trial judge found that on October 6, 1977, claimant, a 25–year fire department veteran, sustained an on–the–job accidental personal injury consisting of "an aggravation of pre–existing hypertension as a result of mental stress and physical strain" while helping to clean up the fire station in which he worked, and "as a result of said injury, claimant has sustained 75 .... per cent permanent partial disability to the body as a whole" for which he was entitled to $18,750. The City of Tulsa appealed to the court *en banc*. That court reviewed the record and found that Simpson's fall on October 6, 1977, was "idiopathic" and his "high blood pressure, dizziness, chronic nervous condition and hypertension are not [causally] related to his employment." It therefore reversed the trial judge's order and entered one denying the claim.

## II

Simpson's request for vacation of the *en banc* order rests on the sole premise that there is "no competent evidence" to support it. The argument is "that aggravation of a pre–existing condition is compensable," and for support he cites *National Zinc Co., Inc. v. Moody*, Okl., 556 P.2d 268 (1976); *Yarbro Constr. Co. v. Griffith*, Okl., 521 P.2d 75 (1974); and *Cassidy v. Harding*, Okl., 451 P.2d 698 (1969). And, adds claimant, "Even Respondent's [City of Tulsa] medical evidence supports our contention . . . [inasmuch as its doctor] stated that the physical and emotional stress of the job would affect claimant's pressure but not his longevity."

The trouble we have with claimant's proof is that we can find no evidence, lay or expert, that his work as a fireman caused or aggravated his elevated blood pressure or nervous condition, or even that either abnormality was responsible for the fall. The so–called idiopathic passing out on October 6, 1977, was not a *cause* of any pathologically based injury but rather the *effect* of some physiological disorder. In order to prevail claimant had to prove (a) that the causative condition resulted from a job–re-

lated accidental injury[2] and (b) the condition partially or totally disabled Simpson permanently.

The evidence is that Simpson went to a physician about a year before the October 1977 incident and was told that his blood pressure was a "little high." He was given some medicine for the pressure problem which he was taking at the time he fell. He also said he had the "shakes" before the fall and this condition became worse. Following the fall, Simpson was again seen by his physician, along with two or three others, who ran several tests on him, told him to "slow down," and prescribed some stronger "blood pressure pills"–and valium– to take at the rate of about eight a day. Claimant's description of his post–fall condition was "I feel like I'm falling apart.... I can't exert myself."

Claimant's physician, G. C. Miller, M.D., a general practitioner, said he saw the fireman March 18, 1978, and received a history from him that on "October the 6th, 1977, while working for the Tulsa Fire Department . . . that he passed out twice [after] . . . cleaning up around the station ...." The patient told of having gone to a Dr. Reed, a Dr. Gunther, a Dr. Brewer and a Dr. Simon Levit. The latter "started him on Diazide, one b.i.d. [twice daily], and Inderal, forty milligram, q.i.d. [four times daily], and Catapress, one daily, and put him on a weight reducing diet." Simpson also told Miller that he "had had no previous problems or injuries in regard to his working . . . [and] no previous problems with his blood pressure prior to October, 1977."

While examining Simpson, Miller recorded a blood pressure of 120 over 90, which increased to 220 over 100 after two minutes of jogging in place. Miller's reasoning regarding the origin and cause of Simpson's elevated pressure is difficult to follow. First the physician said the history he received together with these blood pressure results gave him the "impression Mr. Simpson has severe hypertension, even while on medication, and that the patient has the potential of having a stroke. It was my

---

2. Such pathological injuries as, for example, pulmonary fibrosis in *National Zinc Co., Inc.*, or tumors in *Yarbro Constr. Co.*, or arthritis in *Cassidy*.

medical opinion," continued the medical expert, "that this has been caused by being under continuous stressful situations for prolonged periods of time while working for the Tulsa Fire Department, which culminated on October 6th, 1977. Due to the severity of the high blood pressure, I feel like," he added, "he was temporarily totally disabled to perform ordinary manual labor from October 6th of '77 to the time of my examination and that now he is a hundred percent totally disabled to perform any ordinary type manual labor."

Later, however, Miller said he thought the high blood pressure was "*a direct result of the incident of October 6th, 1977*"[3]—a theory inconsistent with the other. And to add further confusion, Miller came up with yet a third theory, or at least a different foundation for his ultimate conclusion—that the hypertension was caused by Simpson's work because of "the fact that he was not having any problems prior to that October 6th incident"—a "fact," it will be recalled, that is at war with Simpson's testimony.

Akin to these causational incongruities were other problems introduced when the physician admitted high blood pressure can be caused by various physiological abnormalities such as diseased kidneys, constrictive arteries, and excessive weight, and that he performed no tests to rule out such causes, nor, for that matter, made any diagnostic effort to identify the underlying physiological cause of Simpson's elevated blood pressure.

While Miller said he did not know Simpson held down two other jobs in addition to his fire department work, he said this fact would not alter his opinion "Because it [the passing out] didn't happen while he was on the other jobs. It happened," he emphasized, "while he was working for the City of Tulsa Fire Department, October 6th, 1977." Here again the medical expert implied that the work related hypertension occurred suddenly on October 6—a theory, as we said, at

war with his earlier conjecture that the high blood pressure developed gradually over a prolonged period as a result of repeated "stressful situations" all of which occurred, apparently, while he was on duty as a fireman.

The ambiguity of Miller's testimony with regard to the cause of Simpson's hypertension was overshadowed by the unsoundness of his assessment of the fireman's ability to perform ordinary manual labor. To say that Simpson could perform no such labor at all on March 18, 1978, and that he never again would be able to do so, was impeached by the undisputed fact that Simpson was working full time as a fireman in March 1978 and holding down two other jobs. Moreover, he continued to work these three jobs until the day this case was heard by the trial judge on August 2, 1978, at which time he did not testify that he had any intention of quitting any of them. He did say, of course, that since October 6, 1977, he has "cut down on about everything" at the suggestion of his physicians, one of whom advised him not to "pick up over 200 pounds." In our opinion if this five foot eight inch man weighing 177 pounds is able to lift objects weighing up to 200 pounds without physical harm and is otherwise able to carry out the duties required of him as a fireman, carpet cleaner and real estate agent, he is not 100 percent disabled within the meaning of the Workers' Compensation Act.

If an appraisal of Miller's testimony were the only thing facing the *en banc* court its order would be justified. But it had more to support its decision. It had the testimony of a Glass–Nelson Clinic internal medicine specialist, William F. Ewing, M.D. He said he examined Simpson at the request of the City of Tulsa on May 23, 1978, and found his blood pressure to be an "entirely normal" 130/86. He was unable to find any "remedial" cause for the hypertension which he conceded must have been quite high in view of the amount of antihyperten-

---

**3.** (emphasis added)

sive medication the patient was taking. After mentioning that "present Medical opinion holds that environmental factors have little to do with the production of high blood pressure, and [that] genetic factors are much more important" causationally, Ewing concluded Simpson had nothing wrong with him that could be causally related to his work as a fireman.

Thus there is competent evidence to support the *en banc* court's denial of compensation. Under these circumstances its order will not be disturbed on review. *Howey v. Babcock & Wilcox Co.*, Okl., 516 P.2d 821 (1973).

Affirmed.

BACON and NEPTUNE, JJ., concur.